J-A19028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 474 WDA 2025 |

Appeal from the Order Entered March 12, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000069-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: I.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 475 WDA 2025 |

Appeal from the Order Entered March 12, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000070-2023

BEFORE: BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.: **FILED: NOVEMBER 5, 2025**

T.A. ("Mother") appeals from the March 12, 2025 orders that involuntarily terminated her parental rights to her son, J.G., born in February

2014, and her daughter, I.A., born in May 2016 (collectively, "the Children").[1]

After review, we affirm.

We glean the following factual and procedural history from the certified record. Allegheny County Office of Children, Youth, and Families ("CYF" or "the Agency") obtained emergency protective custody of the Children on January 26, 2021, under the following circumstances according to Autumn Smith, CYF clinical manager.

> [T]he family was referred to CYF on January 5, 2021, due to allegations of inadequate supervision, conduct by [a] parent that leaves [a] child at risk, and substance use by a parent. Those allegations were eventually deemed valid.
>
> On January 25, 2021, [Mother] did disclose that she was using cocaine and having unstable mental health. She said she was in need of inpatient treatment.
>
> The family made an arrangement for [Father] and a family friend . . . to care for the Children until [Mother] could get an assessment the next day. And then[,] if she was sent to inpatient treatment, they would continue caring for the Children. [The family friend] would provide babysitting when [Father] was working.
>
> . . .
>
> [The Children, however,] were left with [Mother]. She then left the Children with her paramour at the time, who allegedly also [had substance abuse issues].
>
> [Father] and [the family friend] were informed. They did go pick up the Children, but the Children were removed the next day,

---

[1] The court also involuntarily terminated the parental rights of the Children's father, J.G. ("Father"), pursuant to the same orders. Father filed separate appeals, which we address by separate memorandum at Docket Nos. 476 & 477 WDA 2025.

- 2 -

being that [they] were left in [Mother's] care[,] and she left them with an inappropriate adult.

N.T., 11/12/24, at 17-19.[2]

At the time of the Children's removal, they were ages six and four and were found to be overdue for their age-appropriate medical examinations. J.G. was also found to need eyeglasses. *See id.* at 21, 27. Additionally, there were issues with truancy related to J.G. *See id.* The Children were placed together in a pre-adoptive foster home, where they have remained through the conclusion of the subject hearing, over four years later. *See id.* at 70-71, 164.

We further note that J.G. is diagnosed with attention deficit hyperactivity disorder, for which he takes medication, and he has learning disabilities. J.G. has an individualized education plan and participates in school-based counseling. *See id.* at 21, 25, 54; CYF Exhibit F-2 (Dr. Bernstein report, 11/7/24) at 2. Due to behavioral health concerns, J.G. additionally participates in therapeutic boxing. *See* N.T., 11/12/24, at 25-26. I.A. has no educational or special needs. *See id.* at 27.

The court adjudicated the Children dependent on April 7, 2021. *See* Joint Stipulation 1 at ¶ 12; N.T., 11/12/24, at 15-16. The court established

_____

[2] By way of background, Mother and Father resided together with the Children until two months prior to the Agency involvement with the family. *See* N.T., 12/30/24, at 113-14.

the Children's respective permanency goals as reunification and, in furtherance thereof, ordered Mother to obtain a drug and alcohol assessment and follow any recommended treatment, submit to random drug screens, and undergo a mental health assessment and follow any recommended treatment.[3] **See** N.T., 11/12/24, at 28. These court-ordered directives aligned with the stated goals of the Agency's family plan, which were for Mother to obtain and maintain sobriety and stable mental health. **See id.** As the case proceeded, the court further directed Mother to obtain parenting skills in order to facilitate the Children's medical and educational care; sign releases of information ("ROIs") related to treatment; obtain stable housing; and participate in forensic evaluations. **See id.** at 30. Mother was additionally afforded supervised in-person and virtual visitation. **See id.** at 47.

The orphans' court aptly recounted Mother's involvement with the Agency and with the Children throughout the ensuing dependency proceedings, as follows.

> In 2021, Mother initially engaged with CYF, but in early June[] 2021, Mother ceased contact with the Agency. Then from that point onward, Mother did not have consistent contact with CYF prior to the [termination of parental rights ("TPR")] petition being filed March 30, 2023.
>
> Mother's contact with CYF resumed in June of 2023 regarding visitation with the Children. CYF learned from Mother that she had attempted drug and alcohol treatment with Turning Point; however, Mother was unsuccessfully discharged from that

---

[3] The court additionally established concurrent permanency goals of adoption. **See** CYF Exhibit B (dependency orders).

program in August 2023, due to an altercation she had with another patient. Mother did not sign [ROIs] for her treatment history from 2021 until 2023, after the termination petition was filed. CYF finally received Mother's ROIs in January 2024.

. . .

Mother participated in 40 supervised visits in 2021. Mother attended six visits in 2022. Mother did not visit in 2023. Mother resumed visitation in January 2024. Mother had no contact with the [A]gency and no visits with the Children six months prior to CYF filing the TPR petition.

Mother reconnected with CYF in late October-early November 2023, following her most recent "clean date" of October 12, 2023. Her supervised visits resumed in January 2024. Mother's visits changed to unsupervised in July 2024 at the foster parent's home or in the community. Mother began unsupervised visits at her home in October 2024.

Mother did not participate in the court[-]ordered random screens. CYF was unable to register Mother for the drug screens because she would not meet with CYF. After the TPR was filed, Mother provided CYF screens through her treatment agency.

Mother was ordered to undergo forensic evaluations with Dr. Eric Bernstein, Psy.D., however Mother failed to appear for the individual evaluation scheduled on June 9, 2023. Mother appeared for [individual and interactional evaluations in January 2024 and October 2024].

. . .

The court held eleven permanency review hearings. As late as August 2023, Mother demonstrated minimal compliance with her goals and no progress towards alleviating the circumstances which led to the Children's removal. Further, Mother did not engage in [J.G.]'s educational needs. Mother likewise did not engage in [the Children]'s medical needs when they went into care.

Orphans' Court Opinion, 5/7/25, at 6-9 (footnotes omitted).

The Agency filed petitions for the involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) on March 30, 2023.[4]  Ultimately, the court held a hearing on the Agency's petitions that commenced on November 12, 2024, and continued on December 17, 2024, December 30, 2024, and March 5, 2025.[5, 6]  At the time the hearing began, the Children were ten and eight years old respectively. The Agency presented the testimony of Ms. Smith; Brandy Morgan, Auberle foster care coordinator; Timothy Jashinski, CYF casework supervisor; and Dr.

---

[4] Pursuant to orders of July 22, 2024, the court appointed Aimee Burton, Esquire, as legal interests counsel for J.G. and Andrea Spurr, Esquire, as legal interests counsel for I.A.  Attorneys Burton and Spurr represented the Children in the subject involuntary termination hearing.  Accordingly, the requirements of 23 Pa.C.S.A. § 2313(a) were met.  *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) ("[W]e grant *sua sponte* review to evaluate (1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, whether the orphans' court determined that the child's best interests and legal interests did not conflict.").

[5] As best we can discern, the hearing was delayed, in part, due to an inquiry resulting from Mother's claim of Indian heritage.  *See* Joint Stipulation 1 at ¶ 5.

[6] We note with displeasure that the exhibits from this proceeding were not originally included with the certified record.  We pointedly remind counsel that appellants bear "the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); *see also* Pa.R.A.P. 1921 Note ("Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

Bernstein, a forensic psychologist, who conducted numerous individual and interactional evaluations of this family. Mother and Father testified on their own behalf. Additionally, Mother presented the testimony of Bryn Albee, CYF casework supervisor; and Allison Nespoli, the legal guardian of one of the Children's siblings.[7]

By orders dated and entered on March 12, 2025, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (8), and (b). On April 8, 2025, Mother timely filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on May 12, 2025. The orphans' court issued a Rule 1925(a) opinion dated May 7, 2025.

On appeal, Mother raises the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(8)?

3. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's

---

[7] The Children are the youngest of the five children Mother shares with Father. Mother additionally has three older children. *See* CYF Exhibit F-1 (Dr. Bernstein report, 2/28/24), at 1, 4, 5, 9. None of the Children's siblings are the subject of these appeals.

parental rights would best serve the needs and welfare of [the Children] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 8 (suggested answers omitted).[8]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

---

[8] Attorney Burton and Attorney Spurr filed briefs advocating for this Court to affirm the involuntary termination orders on behalf of J.G. and I.A., respectively.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Accordingly, we analyze the decree involuntarily terminating Mother's parental rights to the Children pursuant to Section 2511(a)(1) and (b),[9] which provide as follows:

_____

[9] Given our disposition in this case with respect to Section 2511(a)(1), we need not review Mother's second issue on appeal which concerns Section 2511(a)(8). *See K.R.*, 200 A.3d at 979 (observing this Court may review one
*(Footnote Continued Next Page)*

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to Section 2511(a)(1) "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" ***In re Adoption of C.M.***, 255

---

subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

A.3d 343, 363-64 (Pa. 2021) (citation omitted) (footnote omitted).  While undefined,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship.  The roster of such positive actions undoubtedly includes communication and association.  The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (internal citations and quotation marks omitted).  Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities."  *Id.* (citation omitted).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically.  *C.M.*, 255 A.3d at 364.  However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct.  *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case."  *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).  Thus, "even where

the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" **L.A.K.**, 265 A.3d at 593. The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." **Id.** As explained by our Supreme Court, "the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." **Id.**

In her first issue, Mother assails the orphans' court's conclusion that the Agency established the statutory grounds to terminate Mother's parental rights pursuant to Section 2511(a)(1). **See** Mother's Brief at 20-23; **see also** Orphans' Court Opinion, 5/7/25, at 17. In so determining, the orphans' court reasoned, in part, "Mother had no contact with the [A]gency and no visits with

the Children six months prior to CYF filing the TPR petition." Orphans' Court Opinion, 5/7/25, at 17 (footnote omitted).

Significantly, in her brief, Mother readily acknowledges that she did not engage in the critical six-month period preceding the filing of the termination petitions on March 30, 2023. *See* Mother's Brief at 23. Specifically, she admits her lack of contact and commitment during the requisite statutory six-month period and beyond. *See id.* at 10. Mother states, "CYF was unable to engage Mother in May or June 2021[,] and Mother stopped visiting J.G. and I.A. in October or November 2021. Mother re-engaged after being served with the TPR petition for J.G. and I.A. Mother contacted CYF in June 2023 and requested visitation with J.G. and I.A." *Id.*

Mother instead emphasizes her engagement and progress **after** the petitions were filed. *See id.* at 23. Mother baldly asserts, "The [orphans'] court erred by not considering the totality of the circumstances, particularly the post-abandonment efforts made by Mother, the post-abandonment contact between Mother and [the Children], and Mother's progression to unsupervised home visitation with [the Children]." *Id.* Mother's argument misconstrues the law and, therefore, fails.

The record reveals that, in January 2024, Mother began to engage with the Agency and the Children, as well as her court-ordered directives, in earnest. *See* N.T., 11/12/24, at 34, 53, 61-62, 77, 79-80, 105-06. However, pursuant to Section 2511(a)(1), the orphans' court was prohibited from

considering Mother's conduct in this regard since it occurred after the filing of the petitions on March 30, 2023. **See** 23 Pa.C.S.A. § 2511(a)(1). In addition, pursuant to Section 2511(b), the orphans' court was prohibited from considering any efforts by Mother to remedy the issues presented which were "first initiated **subsequent** to the giving of notice of the filing of the petition[s]." 23 Pa.C.S.A. § 2511(b) (emphasis added). Here, Mother was served with the subject petitions on June 9, 2023. **See** Joint Stipulation 1 at ¶¶ 8, 9.

Thus, by her own admission, for a period in excess of the statutory six-month timeframe immediately preceding the filing of the involuntary termination petitions, Mother evidenced a settled purpose of relinquishing her parental claim to the Children or refused or failed to perform her parental duties with respect to compliance with her court-ordered directives and/or maintenance of communication with the Children and the Agency. As such, we discern no abuse of discretion with respect to the orphans' court's determination pursuant to Section 2511(a)(1), and we do not disturb it. **See** **C.M.**, 255 A.3d at 358.

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); **see**

*also T.S.M.*, 71 A.3d at 267.  Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis.  We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.  Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability.  As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider.  The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.  And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case."  *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).  However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained.  *K.T.*, 296 A.3d at 1109.  A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm.  *Id.* at 1109-10.  This Court has recognized that,

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up).

In her final issue challenging the orphans' court's termination of her parental rights pursuant to Section 2511(b), Mother argues that, because the Agency failed to satisfy its burden of proof under Section 2511(a), the court should not have considered 2511(b). *See* Mother's Brief at 28. Given our conclusion with respect to Section 2511(a)(1), this claim fails. Moreover,

Mother baldly asserts that the Children "have a beneficial and important relationship" with her. *Id.* She also argues that the court abused its discretion in terminating her parental rights pursuant to Section 2511(b) because it will sever their relationship with their older siblings. *See id.* at 28-29. Lastly, Mother implies that the court erred under Section 2511(b) based upon her assertion that the foster parents prematurely displayed "support of adoption" of the Children which caused them "stress and trauma." *See id.* at 28. For the reasons that follow, Mother's claims fail.

In finding that termination of Mother's parental rights favored the Children's developmental, physical and emotional needs and welfare pursuant to Section 2511(b), the orphans' court stated:

> [T]he Children have thrived and developed a strong bond with their foster parents. The Children appear to love their Mother, but the Children appear to feel more comfortable with the foster parents. The foster parents provided for the Children's needs in all respects, from mental health, to emotionally, physically, and educationally. The Children are safe and secure in the foster home environment. The Children have lived in their care for four years and look to them as their providers. The Children are adjusted in that home and have foster siblings in that home with whom they are likewise attached. The Children have also expressed their desires for adoption to Dr. Bernstein.
>
> [T]he court shares Dr. Bernstein's opinion that the needs and welfare of the Children are best served by preserving their sense of stability, the bond and support the Children receive from foster parents. . . .

Orphans' Court Opinion, 5/7/25, at 29-30 (footnotes omitted). The record supports the court's findings.

- 17 -

Dr. Bernstein testified that Mother and the Children have an "insecure bond." N.T., 12/17/24, at 108. Significantly, there was a period of extended absence from March 2022 to January 2024. Since January 2024, and through the subject proceedings, Mother has participated in supervised visitation, which then transitioned to unsupervised visitation. However, Dr. Bernstein explained that Mother's extended absence resulted in the Children's insecure bond with Mother, as follows:

Q. The insecure [bond], as you actually said there, was that impacted by the extended periods of absence?

A. Yes. . . .

Q. No, you mean the absence between [M]other and the [C]hildren; right?

A. Yes, and the lack of giving the [C]hildren a sense of anticipation if the absence would occur, or the communication of the basis for the absence. That all has an impact upon their own sense of identity and their self-esteem and perspective and emotions and everything else. So it is not just, hey, where is mom, it is over and over and over again. And that builds to a level of crystalized disappointments and a sense of resignation that things are out of their control, and it reinforces in many ways [why] the [C]hildren are invested in their foster placement, where they feel the most secure. And it does have a ripple effect.

N.T., 12/17/24, at 108-09. Moreover, Mother failed to participate in all but one appointment regarding the Children's educational and medical needs, despite her retaining primary decision-making authority. *See* N.T., 11/12/24, at 54-55.

Conversely, the Children had been placed in their current pre-adoptive foster home for over four years by the time the subject hearing concluded.

*See id.* at 70-71, 164. Dr. Bernstein observed, "The [C]hildren share and enjoy a special relationship with [their foster parents] and look to them as their psychological parents." Agency Exhibit F-2 (Dr. Bernstein report, 11/7/24) at 12. Indeed, the Children refer to their foster parents as "mom and dad." N.T., 12/17/24, at 43 (internal quotation marks omitted). Dr. Bernstein explained,

> [T]he Children's foster parents] have fulfilled a parental role, if you will, that the [C]hildren rely upon them for their everyday needs, and have developed a strong bond, that they look to the foster parents to meet their needs, and the [C]hildren had communicated . . . a strong sense [of] comfort and support by both foster parents.

*Id.* at 40.

Dr. Bernstein testified that the Children "strongly endorsed their placement in foster care in a home in which they felt comfortable. Both [C]hildren matched in their enthusiasm about the foster placement." *Id.* at 74. Although he acknowledged severing the Children's relationship with their parents would be a loss to the Children, he stated that the Children's foster parents would "compensate for that with continually offered stability and support." *Id.* at 65.

As such, Dr. Bernstein opined:

> [W]hen considering what is best for the Children, preserving their sense of stability, appreciating that they have developed the strong bond with the foster parents and the foster parents recognize and support sibling contact, and the Children, despite their young ages, have communicated in their own way a desire to remain in their care indefinitely. All of those factors are hard to overlook. And given the totality of circumstances, I supported

the court moving forward with the termination of the parents' rights and with the understanding that that may ultimately mean no further contact with the parents.

*Id.* at 91-92 (cleaned up). Moreover, Dr. Bernstein testified that to remove the Children from their foster parents "could be ultimately detrimental to them." *Id.* at 137.

Similarly, Mr. Jashinski testified, as follows:

Q. Has the Agency been able to take note of any kind of bond that the foster parents and the [C]hildren appear to be bonded to one another?

A. Yes, 100 percent. Like I said, the kids are so comfortable with them. . . . [Y]ou can tell there is a parental role that they are filling for them.

N.T., 11/12/24, at 163-64. He continued, "[The Children] are very comfortable where they are. They . . . want to stay with [their foster parents]. That has been their home for the past four years. They are very comfortable there. They have their own -- They have been integrated into that family." *Id.* at 168-69; *see also id.* at 164-65; *see also id.* at 122, 131, 148, 155-56, 159 (testimony of Ms. Morgan as to the Children's comfort and desire to remain in foster home).

Consequently, Ms. Smith testified that the Children's best interests favored termination of Mother's parental rights so as to free them for adoption. *See id.* at 74. Emphasizing the Children's time in care, Ms. Smith testified that they "deserve to have permanency." *Id.* She further pointed to the fact

that "[t]he [C]hildren themselves identify [that] they want to be adopted."

*Id.*

With respect to her claim that the court erred under Section 2511(b) because it may result in the Children's relationships with their older siblings being severed, Mother is not entitled to relief. Mother's claim is speculative. Further, in this case, the testimony of Ms. Smith and Ms. Morgan, the Auberle foster care coordinator, as well as Dr. Bernstein, reveals that the foster parents support and promote the Children's relationship with their siblings. *See id.* at 105, 134; N.T., 12/17/24, at 91-92. Therefore, we reject her claim.

Likewise, to the extent Mother asserts that the court erred in terminating her parental rights under Section 2511(b) based on the alleged "premature" behavior of the Children's foster parents regarding adopting them, and the stress or trauma that this behavior allegedly caused the Children, the claim merits no relief. Ms. Morgan testified that the Children began to positively discuss having an "adoption party" as a result of their foster parents holding such an event after adopting other children in the foster home. *See* N.T., 11/12/24, at 122, 131, 159. The record is devoid of any evidence that the Children suffered emotional harm as a result of the other children who were adopted in the foster home. Indeed, the testimonial evidence demonstrates that the foster parents meet all of the Children's needs. *See id.* at 25-27, 71, 81, 132, 171-72. In this case, the record amply

supports that the Children's developmental, physical, and emotional needs and welfare will be best served by terminating Mother's parental rights.

Based upon the foregoing, we discern no abuse of discretion by the orphans' court's conclusion that termination of Mother's parental rights will serve the Children's developmental, physical, and emotional needs pursuant to Section 2511(b). The record amply demonstrates that Mother and the Children do not share a necessary and beneficial relationship. *See K.T.*, 296 A.3d at 1109-10, 1113. Instead, the Children share such a relationship with their foster parents. While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

Accordingly, we affirm the orders involuntarily terminating Mother's parental rights pursuant to Section 2511(a)(1) and (b).

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/5/2025

- 22 -